## CALIFORNIA TAHOE REGIONAL PLANNING AGENCY et al., Plaintiffs,

v.

## N.S.C., INC., et al., Defendants.

### No. CIV-R-78-180-ECR.

United States District Court,
D. Nevada.

Nov. 5, 1980.

---

Evelle J. Younger, Atty. Gen., Kenneth R. Williams, E. Robert Wright, Deputy Attys. Gen., Sacramento, Cal., for plaintiffs.

Shaw, Heaton & Doescher by Gary A. Owen, Carson City, Nev., for TRPA and individuals thereof.

Gregg W. Zive, Reno, Nev., for defendant N.S.C., Inc.

Gordon DePaoli, Reno, Nev., for defendant North Shore Tahoe Properties.

## ORDER

EDWARD C. REED, Jr., District Judge.

This matter came on for hearing on October 14, 1980, on the motion of the plaintiffs for a temporary restraining order to restrain the defendants from continuing construction on additions to the Tahoe Mariner hotel and casino (formerly the North Shore Club), located at Crystal Bay, Nevada. Kenneth R. Williams, Deputy Attorney General for the State of California, represented the plaintiffs; Gary Owen, Esq., represented defendants Tahoe Regional Planning Agency and the individual members of that Agency; Gregg W. Zive, Esq., represented defendant N.S.C., Inc.; Gordon H. DePaoli, Esq., represented North Shore-Tahoe Properties.

The contention is that the Tahoe Regional Planning Agency (hereinafter TRPA) violated its own Land Use Ordinance (hereinafter LUO) when it approved the construction project. Essentially, the plaintiffs maintain that sections applicable to land coverage, limitations on height, and administrative findings were misinterpreted and misapplied. Generally, questions concerning the interpretation and application of TRPA ordinances do present federal questions under 28 U.S.C. § 1331(a); although state courts might have concurrent jurisdiction, where interstate conflicts may arise that could substantially affect the effective functioning of the Tahoe Regional Planning Compact between California and Nevada, a federal court has jurisdiction. *League to Save Lake Tahoe v. B.J.K. Corp.,* 547 F.2d 1072 (9th Cir. 1976); *California Tahoe Regional Planning Agcy. v. Jennings,* 594 F.2d 181 (9th Cir. 1979). Such is the case here.

The project approval was by a dual majority; that is, a majority of the TRPA members from each state voted favorably. This constitutes full exercise of TRPA's power of de novo review of decisions of the local (in this case, Washoe County, Nevada) permit-issuing agency. *Id.; People of St. of Cal. ex rel. Younger v. Tahoe Reg. P. Ag.,* 516 F.2d 215 (9th Cir. 1975). As a result, the proceedings before the County authorities (Washoe County approved the project) are immunized from review by this Court. See *California Tahoe Regional Planning Agcy. v. Jennings,* supra. However, the complete administrative record (hereinafter Ad. Rec.) before TRPA has been reviewed by the undersigned.

*Land Coverage*

The plaintiffs contend that the land coverage limitations contained in LUO have been violated. "Land coverage" refers to structures, improvements or coverings that are so impervious as to prevent more than 25% of normal precipitation from directly reaching the underlying land; it includes lands used as parking lots to such an extent the soil has become so compacted that less than 75% of precipitation passes through. LUO 3.00 (definition of "Land Coverage"). A sizable portion (about 35,000 square feet) of the land hereinvolved was merely graded, and has been used for automobile parking without further improvement. It is located mostly in a General Forest land classification area; such land is considered environmentally fragile. The plaintiffs argue that TRPA never really decided whether the graded area had been used for parking prior to the effective date of LUO (April 11, 1972), so as to be grandfathered in as a nonconforming use. See LUO 9.11.

Aerial photos taken before April 1972, as well as other oral and written evidence, were considered by TRPA in resolving this issue. Ad. Rec. B–18, 57, 58, 59, 60, 62, 63, 64, 67, 68, 69, 73, 78, 81, 96, 98, 99, 100, 101 and 114. It decided that less than the entire amount of graded area claimed as nonconforming had been used for parking prior to the effective date of LUO. Therefore, the defendants were required to demolish an existing 29-unit motel and convert that site to landscaping in order to make up the difference. Ad. Rec. A–23 and A–24.

In order to meet LUO requirements, the defendants agreed to convert to landscaping some 60,000 square feet of existing covered land, to compensate for approximately 50,000 square feet of new coverage created

by the improvements under the project. Ad. Rec. A–46 and A–87. The replacement of nonconforming land coverage ordinarily must be at the same location. LUO 9.21(3)(c). That is, if a preexisting (prior to the effective date of the LUO) nonconforming improvement is to be replaced with a new improvement, the usual rule is that the replacement must be at the same site. Nevertheless, an alternative site on the same parcel may be used for the replacement improvement where (a) the applicant demonstrates beyond any reasonable doubt that relocation to the alternative site will protect and enhance the natural environment compared to replacement on the original site (LUO 9.21(3)(c)(i)), and (b) the total nonconforming land coverage on the parcel will be reduced by at least ten percent (LUO 9.21(3)(c)(ii)).

The record reveals that the project should stabilize the area by correcting existing severe erosion problems. (Ad. Rec. A–12). The change from a large open area for parking to a compact two-story parking structure, plus extensive landscaping, would be the prime means of correction. In addition, slope stabilization would be accomplished by using fill to lessen the steepness of the existing embankment and placing gabions in the place of worst erosion, and stormwater drainage would be improved by the use of facilities that cause the stormwater to percolate into the soil rather than run into Lake Tahoe. Ad. Rec. A–24 and A–29. In addition, the bulk of the preexisting coverage is in a fragile area of land capability. It would be landscaped. The new coverage under the project would be in a more durable location. Ad. Rec. A–23.

Thus, there is substantial evidence in the record to show that the "replacement of nonconforming land coverage" requirements of LUO 9.21(e)(c) have been met. Nevertheless, the plaintiffs contend that LUO 7.83, which limits land coverage to fifty percent in cases of non-residential use, and LUO 8.22(2), which forbids the transfer of land coverage from one land capability district to another, are both being violated by the approval of the project. The defendants respond that said ordinance sections are applicable only to virgin areas (parcels without existing nonconforming land coverage). LUO 9.21, they point out, permits the continuance and replacement of nonconforming land coverage where certain requirements are met. As discussed above, those requirements have been met as to the defendants' project.

■ Both the plaintiffs' and the defendants' arguments as to the proper interpretation and application of the land coverage ordinance sections were presented and considered by TRPA. Ad. Rec. B–18, B–64, B–65, B–98 and B–132. The approval of the project indicates that TRPA construes those sections in concurrence with the defendants' position. In the absence of compelling indications that such construction is wrong, the Court should give great deference to it, for TRPA is the agency charged with the administration of the LUO. *People of St. of Cal. ex rel.. Younger v. Tahoe Reg. P. Ag.*, 516 F.2d 215 (9th Cir. 1975); see also *Montana Power Co. v. Environmental Protection Agcy.*, 608 F.2d 334 (9th Cir. 1979). No such compelling indications exist here.

### Limitations on Height

The plaintiffs also contend that LUO 7.13, controlling building height, has been violated as to the new hotel building. Said ordinance section limits the height of buildings to forty feet in a tourist commercial use district, such as is hereinvolved, unless the permit-issuing authority determines that certain safety, aesthetic and environmental considerations have been fulfilled. However, the section also declares: "Only those administrative permits that allow a building or other structure of a height of 45 feet or more shall be subject to Agency (TRPA) review . . . ." "Building height" is defined in 7.13 as the vertical distance from the grade to the roof. "Grade" is defined as the average of the "finished ground level" at the center of all walls of the building.

■ The plaintiffs say that the real height of the hotel building will be in excess of fifty feet, but that the defendants are

unlawfully evading the meaning of section 7.13 by excavating so that one or one and one-half stories will be located under their finished ground level. That subterranean portion of the building then is not included in "building height". As a result of the excavation, combined with the use of fill material around the perimeter of the building, the defendants technically end up with a building whose height is under 45 feet. Therefore, the aforementioned safety, aesthetic and environmental considerations may be ignored, as the TRPA has no review power over Washoe County's approval of the project insofar as building height is concerned. The plaintiffs assert that LUO 7.13 is aimed at population density, as well as the other considerations; i. e., a larger building will attract more traffic. They allege it was never intended that said section could be circumvented by excavating and using fill material.

The TRPA staff summary shows a building height of 44.7 feet. Ad. Rec. A–24. An affidavit of the project's architect, William Schuppel, reveals that the roof elevation since has been reduced by four feet. Said affidavit is attached as an exhibit to a Memorandum of Points and Authorities in Opposition to Motion for Temporary Restraining Order, filed October 14, 1980. Therefore, the present projected building height is 40.7 feet. In either case, it is less than the 45 feet which is the minimum for jurisdiction in TRPA to review the County's approval as to building height.

The plaintiffs' argument was presented to TRPA. Ad. Rec. B–66 and B–128. The defendants acknowledged to TRPA that excavation and the use of fill would be responsible for the building height being under 45 feet. Ad. Rec. B–114 and B–115. Nevertheless, TRPA gave its approval, thereby manifesting its belief that LUO had been complied with. There is no compelling indication that the interpretation of section 7.13 is wrong. Even a subsequent amendment to said ordinance section, which amendment defined "grade" as the "original" ground level, rather than "finished" ground level, provides no suggestion that population density or traffic control are meant to be regulated by means of building height requirements.

*Administrative Findings*

Finally, the plaintiffs contend that TRPA's approval of the project was violative of LUO because of the absence of Agency findings required by two sections of said Ordinance. First, section 9.21(3)(c) states that ordinarily replacements of nonconforming land coverage must be made at the same location. Then it declares: "Where the following is found, however, an applicant may be permitted to locate such replacement as an alternative site on the same parcel: ...." As discussed above, the applicant must prove that relocation of coverage to the alternative site will protect and enhance the natural environment, and, also, the nonconforming land coverage must be reduced by at least ten percent. The plaintiffs assert that TRPA had to specifically find (1) that the graded parking area constituted "land coverage", as defined in section 3.00 of LUO, at the time (April 11, 1972) the LUO became effective and (2) that such coverage, if it did exist, was "lawfully created prior to the effective date of this ordinance". Section 9.21. Second, the plaintiffs argue that TRPA had to make a general finding comporting with Section 8.33, which authorizes the issuance of administrative permits for the uses and purposes covered by LUO. "Such permit may be granted only if it is found by the permit-issuing authority..." that the use or purpose is not detrimental to persons or property in the neighborhood, nor to the environment.

Although it has been declared that where, as here, statute does not require formal findings, they are not necessary if the agency action is unambiguous, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), it is universally recognized that findings serve such a useful purpose that they really ought to be made. They serve to inform interested parties of the bases for the agency action and they are an invaluable aid to a court reviewing the agency proceedings.

The defendants have not strenuously argued that findings are not required. Their primary position on this issue is that TRPA did make the requisite findings when it specifically approved the issuance of the administrative permit for the defendants' project, "based on the findings listed on page 9 (of the staff summary and recommendation dated 2/15/78...." Ad. Rec. B–109, see also B–110. Page 9 of the staff summary is found at Ad. Rec. A–29. Ten recommended findings are there set forth. The pertinent ones here are:

"...

2. The application, including all revisions as of February 14, 1978, satisfies all applicable regulations and requirements of the Land Use Ordinance and is consistent with the goals and policies of the Regional plan.

. . . . .

7. The implementation of the drainage and slope stabilization plan proposed as part of the application will substantially reduce the present erosion occurring on the project site and resulting release of sediments into the waters of Lake Tahoe.

8. The remodeling and renovation of the existing structure on the project site will enhance the aesthetic beauty of the local community.

9. The stabilization and revegetation of the large cut slope located along the north-westerly property line of the project site will eliminate an unsightly excavation scar and therefore enhance the scenic beauty of the Tahoe Basin.

..."

■ TRPA's adoption of the proposed findings of its own staff is permissible. An agency's findings which incorporate by reference staff exhibits may be sufficient if its path can be followed so that judicial review may be accomplished. *Colorado Interstate Co. v. Comm'n*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).

The path followed by TRPA can be followed in the administrative record. At a meeting on November 16, 1977, the following motion was made (Ad. Rec. B–18):

"MOTION by Mr. Kjer to approve the North Shore Club administrative permit with the necessary findings that the establishment, maintenance, or operation of the use or purpose in the particular case is not detrimental to health, safety, peace, morals, comfort and general welfare of persons residing or working in the neighborhood of such proposed use, or detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the Region, and will not cause any substantial harmful environmental consequences on the land of the applicant or on other lands or waters. This approval shall be subject to the conditions placed on the project by the NTRPA and the three additional conditions that: ... In addition, a finding is made that the impervious surface which is being traded existed in 1971. In addition to the above conditions, the standard conditions applicable to commercial projects shall be imposed."

As can be seen, the motion included both the general finding, in accordance with section 8.33, and the specific finding, in accordance with section 9.21, that the plaintiffs insist are necessary under LUO. Five members voted in favor of the motion and three against. A majority of the Nevada members present approved, whereas a majority of the California members present disapproved. Thus, technically, no action was taken, for Art. III(g) of the Compact states: "A majority of the members present representing each state shall be required to take action with respect to any matter." LUO 4.32 has been construed to require a dual majority for a vote to amount to "final action"; yet, if final action is not taken within sixty days, the decision of the local permit-issuing authority (approved by Washoe County in this case) in effect stands affirmed. *People of St. of Cal. ex rel. Younger v. Tahoe Reg. P. Ag.*, 516 F.2d 215 (9th Cir. 1975). Therefore, unless further action was promptly taken by TRPA, the project would be deemed permitted, as approved by Washoe County.

The defendants, however, agreed to waive the sixty-day rule until January 26, 1978. Ad. Rec. B–81. The waiver later was extended until February 23, 1978. Ad. Rec. B–106. The reason for the extra time was to resolve nagging doubts about air quality, transportation impact and the extent of the graded parking area. Ad. Rec. B–81, B–84, B–96, B–100 and B–106.

On February 22, 1978, Mr. Kjer again moved to approve the permit based on the aforementioned staff findings and conditions. Ad. Rec. B–109. After failing to obtain a dual majority once more, it was explained to the members that TRPA could not impose its own conditions unless it approved the project with a dual majority. In order to accomplish this objective, two of the California members switched their votes from disapproval to approval. Ad. Rec. B–110 and B–139.

While the motion that thus passed did not literally contain a specific finding that the nonconforming land coverage had existed prior to the effective date of LUO (as had the November 16, 1977, motion), the record reveals that the matter was again discussed at some length just prior to the voting. Ad. Rec. B–109, B–113, B–128 and B–132. It would fly into the face of the record to conclude that the dual majority vote of approval was made with an unexpressed belief that the nonconforming land coverage involved really wasn't nonconforming. The staff's general finding, adopted by TRPA, that all applicable regulations and requirements of LUO had been satisfied, is firmly supported by the record.

### Temporary Restraining Order

Two tests have been approved by the Ninth Circuit for determining the propriety of granting preliminary injunctive relief. These are discussed in footnote 4 at page 288 of *City of Anaheim, Cal. v. Kleppe*, 590 F.2d 285 (9th Cir. 1978). The traditional test is: (1) have the movants established a strong likelihood of success on the merits; (2) does the balance of irreparable harm favor the movants; and (3) does the public interest favor granting the injunction. The alternative test requires a clear showing by the movants of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See also, *United States v. City of Los Angeles*, 595 F.2d 1386 (9th Cir. 1979).

The Court has received considerable evidence as to hardships and irreparable injuries that may be suffered by each side if the requested temporary restraining order is granted, or if it is denied. Basically, the defendants would suffer great financial reverses if they are enjoined from continuing construction. Contractual obligations involving financing, construction and leasing have been incurred in reliance on the TRPA approval. On the other hand, the plaintiffs feel that the worthwhileness of their eventual success on the merits in this case would be greatly diminished if the improvements to be constructed under the project are already in place at the moment of victory. Actually, the defendants seem to be taking a calculated risk in commencing and continuing construction while the lawsuit is pending. It seems to emphasize the severity of the losses they could incur if construction were halted. At the least, the balance of hardships cannot be said to tip decidedly towards the plaintiffs.

The likelihood of success on the merits, also, does not seem very strong for the plaintiffs in the present posture of this litigation. A study of the administrative record and the exhibits leaves the Court with the impression that TRPA considered fully all of the legal, factual and emotional (policy) arguments raised herein, before approving the project with a dual majority. No legal errors have been found as to land coverage, height limitations or findings, as discussed above. Further, the defendants have indicated that they feel the statute of limitations will bar this lawsuit.

It may be that the Nevada 25-day statute of limitations (NRS 278.027) applies to actions of this type. *California Tahoe Re-*

*gional Planning Agency v. Jennings*, 594 F.2d 181 (9th Cir. 1979); see also, *League to Save Lake Tahoe v. Tahoe R.P.A.*, 93 Nev. 270, 563 P.2d 582 (1977). Although legal action was commenced in this U. S. District Court for the District of Nevada within said limitation period in the case of *California Tahoe Regional Planning Agency v. N.S.C., Inc., and the Tahoe Regional Planning Agency*, CIV–R–78–46–BRT (1978), the action was dismissed without prejudice on October 18, 1978. The reason was that a "procedural quagmire" had developed as to the addition of new parties and as to the position of the California Attorney General. However, the order of dismissal specifies that it would " . . . permit the filing of whatever new action the Attorney General of California deems advisable by parties of his choice against parties of his choice. No significant prejudice will be suffered by anyone by such procedure . . . ." Nineteen days later (on November 6, 1978) the Court denied a motion to vacate its order of dismissal, stating: "A new action by proper parties against proper parties could have been filed and process served long before this."

 The general rule is that when there has been a dismissal without prejudice, the statute of limitations is deemed not to have been tolled or suspended during the period in which the action was pending. *Moore v. St. Louis Music Supply Co., Inc.*, 539 F.2d 1191 (8th Cir. 1976). However, there have been cases reaching the opposite conclusion, i. e., the statute is deemed tolled by reason of the commencement and prosecution of the first action. *Adams v. Collier*, 122 U.S. 382, 7 S.Ct. 1208, 30 L.Ed. 1207 (1887); *Atkins v. Schmutz Manufacturing Company*, 435 F.2d 527 (4th Cir. 1970). In addition to this uncertainty, this Court is not certain that the 25-day Nevada statute is applicable here. While applying it in a case involving default approval (no dual majority), the *Jennings* opinion, supra, states, at 594 F.2d 190: "Here we do not confront a direct attack on an action of the TRPA or a call for an interpretation of the substance of the Ordinance, for which a stronger argument for a uniform limitations period exists."

The parties have not been given a full opportunity to brief and argue the statute of limitations issue, for it is not directly involved in the instant motion for a temporary restraining order. It merely bears upon the likelihood of the movants' (plaintiffs') success on the merits. In light of the uncertainty as to the appropriate statute and whether it was suspended by the first lawsuit, the Court chooses not to give the statute of limitations any weight either way in deciding the motion.

■ As explained above, the plaintiffs have not sustained their burden of demonstrating either (1) probable success on the merits and the possibility of irreparable harm, or (2) serious questions going to the merits and a balance of hardships tipping sharply in their favor. See *United States v. City of Los Angeles*, 595 F.2d 1386 (9th Cir. 1979).

IT IS, THEREFORE, HEREBY ORDERED that the plaintiffs' motion for a temporary restraining order be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that a time for hearing the plaintiffs' request for a preliminary injunction be set only if any party hereto demands such a hearing. If such a demand is made, the Clerk of Court shall set a time for hearing.